UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

PREMIER CONCRETE, LLC,                              No. 11-10-11154 JA

        Debtor.

## MEMORANDUM OPINION

This matter is before the Court on the Debtor's Motion to Sell Unencumbered Vehicles, filed April 8, 2010 (Docket 41). Bank of Albuquerque objected. The Court held an evidentiary hearing on the motion and objection on April 29, 2010. Counsel appeared as noted on the record. Having heard and considered the evidence, and argument of counsel, the Court denies approval of the proposed sale.

### BACKGROUND

Premier Concrete Inc. ("Premier" or "Debtor") conducted business as a specialty contractor for the concrete portion of commercial and residential projects. Premier has ceased operations, and has filed a motion to convert its chapter 11 case to a case under chapter 7. Bank of Albuquerque (the "Bank") has also filed a motion to convert this case to chapter 7. The Bank is Premier's largest creditor, with a claim scheduled in the amount of $1,900,000. The Debtor scheduled the Bank has holding a secured claim in the amount of $712,312.05 and an unsecured claim in the amount of $1,187,687.95. *See* Schedule D (Docket No. 32). Premier Concrete's total scheduled indebtedness is $2,218,073.84. *See* the Schedules.

Premier's records reflect unpaid post-petition wages to its employees in the amount of approximately $26,407.30, exclusive of payroll taxes and other items.[1] Premier seeks court approval for the sale of 22 vehicles and 15 trailers for the total sales price of $75,000 to Danny McCallister, Danny's Used Cars, for the purpose of paying post-petition wages and post-petition professional fees prior to conversion of this case to chapter 7.[2] A bulk sale of the vehicles and trailers is not within the Debtor's ordinary course of business. None of the vehicles or trailers has any lien holder identified on the titles. The Court granted Bank of Albuquerque a lien against the vehicles and trailers in an amount not to exceed $38,759.57 as adequate protection for use of $38,759.57 of cash collateral to pay pre-petition wages.

Bank of Albuquerque ("Bank") objected to the proposed sale on three grounds: 1) the vehicles and trailers have a value substantially in excess of Premier's proposed sale prices for the property; 2) the payroll for which Premier proposes to pay from a portion of the sale proceeds was not actually earned; and 3) the Bank should be given a lien on the entire proceeds from the sale because of authorized use of cash collateral and a post-petition decrease in the Bank's collateral position.

The Court finds that the Debtor has failed to sustain its burden to show that the proposed sale of the vehicles and trailers in bulk for $75,000 is a reasonable exercise of the Debtor's business judgment. Because the Court finds that the sale cannot be approved for this reason, it need not address the other grounds for the Bank's objection to the sale.

---

[1] *See* Exhibit 11
[2] At the preliminary hearing on Bank of Albuquerque's motion to convert, the Court suggested that the Debtor consider selling vehicles unencumbered by any perfected liens, other than a replacement lien granted at a cash collateral hearing, so rank and file employees could be paid post-petition wages prior to conversion of the case to chapter 7; such sale to be subject to court approval.

FACTS

The principal of the Debtor, Kevin Chavez, made a concerted effort to sell the vehicles and trailers within a short time so the Debtor could pay post-petition wages and professional fees prior to conversion of this chapter 11 case to chapter 7. Many of the vehicles have condition problems. Most of the 22 vehicles the Debtor seeks to sell have over 100,000 miles. Four or five of the vehicles will not start, including three or four that have blown transmissions.

Employees of the Debtor made as many as sixty telephone calls to competitors in the concrete business in an attempt to locate buyers for the vehicles and trailers. Those efforts yielded only a couple lowball, unreasonable offers. Mr. Chavez then contacted Randy Eastburg, "the only person I know in the [automobile] industry." Mr. Eastburg put Mr. Chavez in contact with Danny McCallister. Mr. McCallister came to Premier and inspected the vehicles and trailers. He McCallister made an offer to buy all the vehicles and trailers in question for $75,000. Mr. Chavez did not talk to anyone in the business of selling vehicles other than Mr. Eastburg and Mr. McCallister, and accepted the first and only offer he received to buy vehicles and trailers in bulk. Mr. Chavez did not tell Mr. McCallister how much he needed for the vehicles and trailers to cover payroll, the Bank's replacement lien, and post-petition professional fees. Mr. Chavez candidly admitted he was desperate to sell the vehicles and trailers quickly to take care of employees who live pay check to pay check, and that if he had more time to sell the vehicles and trailers Premier may get a higher price, perhaps $80,000 to $100,000. However, on a quick sale basis Mr. Chavez believes $75,000 is a fair price.

The Bank's expert, C.L. Bentley, estimated the vehicles and trailers would sell for approximately $168,000 "as is, where is" at a properly advertised and conducted auction,

yielding approximately $150,000 to the seller after deducting a 10% sale commission. Mr. Bentley also estimated the vehicles and trailers to be worth between $120,000 and $170,000 at a quick sale, less costs of sale. The Court finds Mr. Bentley's valuation to be problematic. The Bank sent Mr. Bentley a list of the vehicles and trailers that included a Bank suggested value for each item. Of the values the Bank suggested, Mr. Bentley accepted all but three of them as his pre-inspection estimates of value, although he made further adjustments after inspecting the vehicles and trailers. Mr. Bentley used a "comparable" sales approach for his valuation, based on sales within the past three years, but regarded certain sales of different makes and models, or different model years, to be comparable. Mr. Bentley made no effort to start the vehicles since he did not ask for and was not provided keys when he inspected them.

## DISCUSSION

Pursuant to 11 U.S.C Section 363(b)(1), a debtor in possession may sell property of the estate "other than in the ordinary course of business" after notice and a hearing. A bulk sale of 22 vehicles and 15 trailers was not within the Debtor's ordinary course of business.

In determining whether to approve a sale outside the ordinary course of business under 11 U.S.C Section 363(b)(1) courts generally apply a business judgment test. *E.g. In re General Motors Corp.,* 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009); *In re Derivium Capital, LLC,* 380 B.R. 392, 404 (Bankr. D.S.C.2007); *In re Psychrometric Systems, Inc*., 367 B.R. 670, 674 (Bankr.D.Colo.2007). Non-exclusive factors used by courts in considering whether to grant a motion to sell (as first established *In re Lionel,* 722 F.2d 1063, 1071-72 (2nd Cir. 1983), which articulated the "business judgment" test) include: 1) whether there was any improper or bad motive involved; 2) whether the price is fair and reasonable and whether the transaction occurred at an arm's length; and 3) whether there were adequate sales procedures,

including proper exposure to the market and fair and reasonable notice to all parties in interest. *E.g. In re Castre,* 312 B.R. 426, 428 (Bankr.D.Colo. 2004); *In re Medical Software Solutions* 286 B.R. 431, 440-441 (Bankr.D.Utah 2002). *See also In re Allison*, 39 B.R. 300, 303 (Bankr. D.N.M. 1984 ("reasonable and adequate notice must be given to all interested parties," the proposed sale or lease must be "economically reasonable" and that objecting parties will not be able to defeat a plan of reorganization).

Here, the Debtor has not sustained its burden to show that the proposed sale of the vehicles and trailers in bulk for $75,000 is a reasonable exercise of the Debtor's business judgment. In making this determination, the Court does not rely on Mr. Brentley's opinion of value and does not question the Debtor's good faith. The Debtor, in good faith, located a buyer for the assets for the commendable purpose of paying employees post-petition wages so payment would not be delayed after conversion of this case to chapter 7. However, accomplishing this worthwhile purpose does not by itself justify the proposed sale of the assets.

The Debtor is not experienced in the sale of vehicles and trailers in bulk, and did not adequately expose the assets to the marketplace. The Debtor conducted no advertising. The Debtor made no reasonable investigation to ascertain the value of the assets. The Debtor's president spoke with the only person he knows in the business of buying vehicles in bulk, who referred the Debtor to a single buyer. The Debtor accepted the first and only offer made from that prospective buyer to purchase the assets out of a sense of urgency to complete a sale in a short period prior to conversion of this case to chapter 7. This is not sufficient to support a finding that the Debtor exercised reasonable business judgment in accepting the purchase offer.

The Court, therefore, concludes that the Debtor's Motion to Sell Unencumbered Vehicles should be denied. An appropriate order consistent with this Memorandum Opinion will be entered.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Entered on Docket Date: May 3, 2010

Copies to:

Chris W Pierce
Hunt & Davis, P.C.
P.O. Box 30088
Albuquerque, NM 87190-0088
*Attorneys for Debtor in Possession*

William R. Keleher
Jason C. Bousliman
MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.
Post Office Box 2168
Albuquerque, New Mexico 87103-2168
*Attorneys for Bank of Albuquerque, N.A.*